12 CV 0988

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

Imoite Ipaalinyang Omulepu,       :

           Plaintiff,          :

                               :

                               :

                               :

                 v.                :

THE UNITED STATES PEACE CORPS      :
Aaron S. Williams, as Director of Peace Corps;      :
OFFICE OF MEDICAL SERVICES (OMS),      :
PEACE CORPS
Barry George Simon, M.D.      :
as Medical Director,      :
Myrna D. Charles,      :
as Chief of Epidemiology & Surveillance      :
and Angela Wiltse, R.N.      :
Peace Corps Response Nurse,      :
Program Manager, Peace Corps,      :

              Defendants.        :

------------------------------------------------------------X

**CIVIL ACTION NO.**

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

**JURY TRIAL
DEMANDED**

## COMPLAINT

## PRELIMINARY STATEMENT

This is an employment-related action for violations of Imoite I. Omulepu's civil rights by his federal employer, The Peace Corps, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The employer engaged in unlawful employment discrimination when Mr. Imoite Ipaalinyang Omulepu (the Plaintiff) was denied medical clearance, which was upheld on appeal to serve as a Peace Corps Response Volunteer in Namibia, resulting in his non-selection for the Peace Corps Response Volunteer position of Kavango Basket Project Liaison in Northern Namibia.


RECEIVED
FEB 07 2012
PRO SE OFFICE

The improper use of discretion by the Office of Medical Services (OMS) at the Peace Corps was in violation of Title VII by basing their final medical decision on a Glucose-6-Phosphate Dehydrogenase (G6PD) genetic test, which is unlawful under the Genetic Information Non-Discrimination Act of 2008 (GINA Title II). The plaintiff cooperated and corroborated in an Equal Employment Opportunity investigation of discrimination based on race, sex, disability (Mental/Physical) and genetic information.[1]

On January 6, 2012, the agency concluded their investigation and issued their Final Agency Decision (FAD) (Exhibit 1). The FAD stated that the Plaintiff, "has not proved by a preponderance of the evidence that he was discriminated against based on his disability, genetic information, race, and sex, when he was denied medical clearance, which was upheld on appeal, to serve as a Peace Corps Response volunteer position of Kavango Basket Project Liaison in Northern Namibia." Included in the FAD was the agency's issuance of a Notice of Right to Sue letter that, authorizes Mr. Omulepu to file this civil action in an appropriate U.S. District Court (Exhibit 2).

The Plaintiff has suffered from lack of employment opportunities, emotional damage from being wrongfully categorized as disabled and financial hardship in pursuing his formal complaint through the American Diversity Program (ADP). The cumulative effect of this process has detrimentally affected the Plaintiff's confidence in pursuing his projected career aspirations of working on the African Continent. This case challenges the legality and constitutionality of the denial of medical clearance based on genetic information.

---

[1] The Plaintiff had to "write in" Genetic Information because the forms did not include genetic information under GINA Title II.

## JURY DEMAND

The Plaintiff herein hereby demands a trial by jury on all issues in this civil action.

**WHEREFORE,** the Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendant.

## PARTIES

1.

The Plaintiff, Mr. Imoite Ipaalinyang Omulepu, a first generation African-American, served as a Peace Corps Volunteer (PCV) in Mali, West Africa, from 2002-2004.  Before his service, the Plaintiff was required to pass a medical clearance approving him for work in sub-Saharan Africa.  At the time of his deployment in 2002, the medical clearance did not require genetic testing for glucose-6-phosphate dehydrogenase (G6PD).  However, at the Plaintiff's completion or close of service (COS) in 2004 and his return to the United States, G6PD testing was required.  Plaintiff's Peace Corps Close of Service Medical Evaluation shows that he was qualitatively tested for G6PD in September 2004. The Plaintiff's test results were "normal."[2] Consistent with COS procedures required for U.S. travelers who return from malaria-endemic zones, the Plaintiff was prescribed and completed a course of primaquine.[3] Plaintiff completed the prescribed dose of primaquine with no adverse reaction.

2.

Defendant UNITED STATES PEACE CORPS (Peace Corps) is an executive agency of the United States, represented by **Aaron S. Williams, as Director**.   Its headquarters is located in Washington, D.C. The Peace Corps engages in commerce for the purposes of Title VII and qualifies as an employer within the meaning of the statute and regulations at issue.

---

[2] The two options on the form were "normal" or "deficient."
[3] Primaquine is a drug designed to reduce the incidence of malaria.

3.

The Defendants, Barry G. Simon, M.D., Medical Director; Myrna D. Charles, Chief of Epidemiology and Surveillance; and Angela Wiltse, R.N., Program Manager, are employees of the Office of Medical Services (OMS) in the United States Peace Corps and are collectively named defendants herein their official capacities.

## JURISDICITION AND VENUE

4.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, Title VII, and related sections applicable as the United States and/or its agencies are named defendants to the action. Litigation is authorized by 42 U.S.C. § 1983.

5.

The unlawful employment practices alleged below were committed and/or executed by supervisory personnel of the Peace Corps ("The Peace Corps" or "employer"), an executive U.S. government agency required to comply with all laws applicable to federal executive branch agencies. The claims arise from events in New York County in the State of New York. Accordingly, venue lies in the United States District Court for the Southern District of New York under 42 U.S.C. §§ 2000e to 2000e-17; 42 U.S.C. §§ 2000e-5(f)(1); 42 U.S.C. §§ 2000ff; 42 U.S.C. §§ 12101-12117. This action arises from the federal laws cited above.

## STATEMENT OF FACTS

6.

Seven years following his service in Mali, the Plaintiff applied to the Peace Corps Response Kavango Basket Project Liaison position in northern Namibia. Plaintiff's date of application was March 11, 2011. Peace Corps Response recruiter, Ms. Julie Thompson, conducted a phone interview and reviewed the Plaintiff's final application. On April 8, 2011,

Plaintiff was invited to serve as a Peace Corps Response Volunteer (PCRV).[4]  In the email, the Plaintiff was urged to expedite his acceptance and legal and medical clearances since he was scheduled to deploy to Namibia in late May/early June 2011.

7.

On April 12, 2011, Plaintiff received an email from Ms. Angela Wiltse, R.N. detailing the processes for obtaining medical clearance.[5]  Plaintiff formally accepted the invitation to serve as a PCRV.  In an April 15, 2011 letter, Ms. Thompson acknowledged Plaintiff's acceptance "pending legal and medical clearances."  The letter stated the other required forms the Plaintiff had to complete and return within five days.  The Plaintiff complied and filled out the forms in the required timeframe.

8.

On April 29, 2011, Plaintiff completed the required medical examination and tests for his medical clearance.  He returned the medical clearance packet, which included the laboratory test results from his G6PD screening, to Ms. Wiltse on April 29.

9.

On May 5, 2011, Plaintiff received a phone call from Ms. Wiltse regarding the G6PD test results.  Ms. Wiltse informed Plaintiff that, the Peace Corps "may have issues with the test" because the quantitative test results came back "abnormal."  However, she also offered that the result could be a false positive and suggested Plaintiff get re-tested.  The Plaintiff informed Ms. Wiltse of the "normal" qualitative G6PD test results he received in Mali in 2004.  Ms. Wiltse informed Plaintiff that in 2008, the Peace Corps changed their policy regarding the type of required genetic testing for G6PD.  Effective in 2008, the Peace Corps

---

[4] This invitation for employment came in the form of a letter dated April 8, 2011, transmitted by email.
[5] Ms. Wiltse is a Peace Corps employee.

required that individuals pass a quantitative test.[6] Ms. Wiltse further explained that, in 2008, the Peace Corps also established a mandatory policy that anyone who tested positive for a G6PD deficiency was ineligible to serve in malaria-endemic countries, areas, or zones. Finally, on this call, Plaintiff requested more medical information from Ms. Wiltse regarding his newly diagnosed deficiency. Ms. Wiltse followed up to this request later that afternoon, and emailed the Plaintiff links to medical research on G6PD deficiency. The email also urged Plaintiff to be tested again because of the possibility of a false positive. Plaintiff re-tested for G6PD deficiency on May 12, 2011.

10.

On May 18, 2011, Plaintiff faxed the results of his second test to Ms. Wiltse. The results of this second test confirmed his G6PD deficient status. On May 19, 2011, Ms. Wiltse sent the Plaintiff a letter via U.S. mail informing him that the Peace Corps Pre-service Review Board (PRB) was unable to clear him for service because of the positive test results for the G6PD deficiency. The letter also detailed the review process if the Plaintiff wanted to appeal the PRB's decision. In order to appeal the decision, the Plaintiff needed to consult a new doctor and forward new medical evidence to the Peace Corps Medical Office within thirty (30) days to support a reversal. This new evidence from a doctor would have to attest to the applicant's ability to volunteer in a malaria-endemic zone. For the review, the Plaintiff also needed to provide a statement of why the decision should be reconsidered. In addition, on May 19, 2011, Plaintiff received a phone call from Ms. Wiltse informing him of the denial. During this phone call, the Plaintiff learned that the PRB, which considers the appeals, meets every Wednesday.

11.

_____
[6] Again, the test in Mali in 2002 was qualitative, or with no lab values. According to Ms. Wiltse, the fact that the 2002 test was qualitative rendered it inadequate for The Plaintiff's medical clearance.

In compliance with the process for an appeal, on May 20, 2011, Plaintiff consulted with David G. Savage, M.D., a hematologist, and professor at Columbia University's College of Physicians and Surgeons, about his case.   After an exploratory physical examination and spectral analysis of Plaintiff's blood under a microscope, Dr. Savage wrote a letter to the Peace Corps stating that in his professional, medical opinion, Plaintiff was "not at risk of clinically significant primaquine induced hemolysis if he return[ed] to sub-Saharan Africa." The letter detailed how to reduce the risk of adverse reaction for a G6PD deficient individual, and clearly stated that the Plaintiff was not at risk of such an adverse reaction.   Further, in compliance with Ms. Wiltse's instructions for appeal, Plaintiff included an official appeal letter with Dr. Savage's letter.

12.

On May 24, 2011, the Plaintiff emailed Ms. Wilste to confirm receipt of all materials.   An automatic response email from Ms. Wiltse's account noted she was out of the office, but directed individuals to forward emails of importance to her assistant, Ms. Laura Foradori. Plaintiff forwarded the email of May 24 sent to Ms. Wilste to Ms. Foradori on May 25, 2011.

13.

The Pre-Service Review Board (PRB) reviewed The Plaintiff's case on Wednesday, May 25, 2011.  The decision of the Board to uphold the denial of Plaintiff's medical clearance was conveyed to him via a phone call from Ms. Wiltse on May 26, 2011.   During the call, Ms. Wiltse disclosed that a heated discussion of Plaintiff's case took place at the Board meeting, and that there was an intense debate prior to the ultimate decision. Ms. Wiltse also informed the Plaintiff that while he was ineligible to serve in malaria-endemic zones, he was not precluded from serving as a PCRV in other zones.   The Plaintiff inquired about the credentials of the Board members who determined his fate.  Ms. Wiltse confirmed that an

epidemiologist and nurse served on the Board and helped to make the decision, but she declined to confirm whether any medical doctors were present and also declined to give the names of any Board members.  The Plaintiff asked Ms. Wiltse to send a letter detailing the basis of the Board's decision and identifying the Board members and their credentials.[7] Finally, Plaintiff informed Ms. Wiltse that he was interested in filing an informal complaint of the PRB process.  Ms. Wiltse did not provide any further information on how to file an informal complaint, but stated that the matter was not open to further discussion.

14.

On May 31, 2011, Plaintiff received a priority overnight UPS package from the Peace Corps containing just his passport.[8]

15.

As described above, The Plaintiff was offered the position of Peace Corps Response Volunteer for service in Namibia.  That being the case, The Plaintiff is considered an "applicant" under MS 293 and other relevant Peace Corps standard policies.  (As other civil rights laws define "employee" broadly to include applicants, The Plaintiff is also considered an employee in this instance and entitled to the protection of anti-discrimination laws.)  The Plaintiff therefore has a right to bring a claim of discrimination against the Peace Corps.  It is noted that the "Volunteer Discrimination Complaint Procedure," published as a part of the Peace Corps Manual Section (MS 646) on July 31, 1981, remains in effect although the posted policy states it is "currently being revised."

16.

---

[7] It appears that request was ignored until The Plaintiff proceeded with filing an informal complaint.  A letter dated May 26, 2011 was written and mailed on June 14, 2011.  The letter is discussed later in this statement.  Once received, the letter only described the basis of the Board's decision in general terms, but failed to identify the deciding members and their credentials.

[8] Plaintiff's passport had been turned over to Peace Corps staff during the preceding weeks as a part of the application process.  In the May 31, mailing, no cover letter accompanied The Plaintiff's passport.

Plaintiff's offer of employment and completion of the pre-requisite medical and physical clearances, guarantees him protection under a number of laws including the Peace Corps policy analogous to the Civil Rights Act of 1964[9] (Title VII), The American with Disabilities Act (ADA) and the Genetic Information Non-Discrimination Act of 2008[10] (GINA) (Title II).

17.

The invitation for The Plaintiff to serve as a PCRV does not suggest discrimination in the initial hiring or applicant process.  However, the specific act of discrimination alleged here arose from the treatment of The Plaintiff, namely the revocation of his PCRV offer, once quantitative laboratory tests determined he was G6PD deficient.  The Plaintiff was summarily denied the opportunity to work in sub-Saharan African countries because of a perceived disability and his genetic information.

18.

A glucose-6-phosphate dehydrogenase (G6PD) deficiency does not appear to be an absolute bar for applicants to serve in malaria-endemic zones.   Plaintiff takes issue with the PRB review process, which on its face, appears to have allowed for the consideration of additional evidence in order to determine whether an applicant can indeed be permitted to serve in a malaria-endemic zone despite having the G6PD deficiency.   The fact that

_____

[9] In response to his inquiry, on July 5, 2011,  Plaintiff was informed in writing that he is not entitled to the protections of the Civil Rights Act of 1964, as the Act is for Federal employees and employee applicants. While  Plaintiff does not necessarily concede this point about the applicability, he was informed in the same email message that the Peace Corps policies cover him as an applicant, and that these policies include all of the [protected] categories under the Civil Rights Act of 1964 (Title VII).

[10] The American Diversity Program informed The Plaintiff of the non-adherence to the Civil Rights Act of 1964 but of the existence and applicability of an analogous Peace Corps policy, on July 6, 2011.  Plaintiff inquired whether the  Genetic Information Non-Discrimination Act of 2008 (GINA) protected him as a Peace Corps applicant.  He was informed in writing that the Peace Corps policy statement that protects volunteers and volunteer applicants is based off of GINA and that the policy is being revised in the [Peace Corps] Office of General Counsel to include genetic information.  As it is not clear where the revision of the Peace Corps GINA policy stands, The Plaintiff does not know which standards are being applied in determining his fate.  However, he believes that the GINA policy should be applicable and should support his claim.

additional medical information was allowed to be presented to the PRB, and that there was "a heated discussion" and "an intense debate" related to The Plaintiff's case suggests there was a window of opportunity for those therein assembled to determine his fate.  Again, the fact that this matter was open to such discussion and debate underscores the opportunity for professional opinions to determine whether The Plaintiff could serve in Namibia.  Had a fixed policy been in place that categorically prevented those with G6PD deficiency from serving in malaria-endemic countries, there would be little room for debate.

19.

The medical opinion of Dr. David Savage should have held more weight and should have been sufficient to allow The Plaintiff to serve as a PCRV in Namibia.  As it relates to the claim of genetic discrimination, GINA prohibits the presence of a genetic variant that virtually guarantees the later development of a disease or condition to, by itself, equal the diagnosis of the disease.  Here, the PRB apparently allowed the presence of the genetic variant, G6PD deficiency, to equal the diagnosis of a physical state that prevents The Plaintiff from serving.  As Ms. Wilste stated on May 5, 2011, the PRB "may" have problems with The Plaintiff's abnormal results.  This suggests a subjective process, one that could allow The Plaintiff to serve in Namibia.  Had it been the case that The Plaintiff was categorically barred for service, that message should have been relayed more objectively.

20.

The Plaintiff has never seen the G6PD policy stated in recruitment materials received via mail or posted on the Peace Corps website.  The Plaintiff believes that the unavailability of this policy has served to disadvantage him in his appeal, as it is not clear which specific aspects are objectionable.  The Plaintiff does not know if the G6PD policy bans those with a specific genetic variation from serving in malaria-endemic areas or if the policy states the

*possible* contraindication with primaquine as the prevailing reason for those with the genetic variation from serving in malaria-endemic areas.

21.

Unique facts of The Plaintiff's case warrant special consideration. He indeed has been a part of the Peace Corps system previously, from 2002 – 2004, where he served in another malaria-endemic area. His genetic make-up in 2002 was the same as it is now; it was only the testing of his genes that did not evidence the deficiency in question. The fact that The Plaintiff served in Mali without contracting malaria, without his G6PD deficiency being recorded or detected <u>and</u> with no adverse reaction to taking primaquine upon return to the United States, all suggest that he is indeed a special case that warrants particular consideration. Despite the letter from Dr. Savage to the contrary, the PRB ultimately determined that it could not rule out the potential risk of hemolytic reaction to primaquine. The potential for any such reaction has already been tested by The Plaintiff's stay in Mali in 2002 – 2004. He had no adverse reaction from his time in Mali *and* from his receipt of primaquine. Coupled with the letter from a qualified medical professional who is familiar with The Plaintiff's medical records and laboratory results, the facts in this case warrant at the very least a thorough medical review of the nuances of the applicant's case by qualified professionals. The Plaintiff argues that the facts are sufficient to allow him to be employed by the Peace Corps and deployed to Namibia for his assignment.

22.

Experience has found no adverse reaction from The Plaintiff being stationed in a malaria-endemic country. To the contrary, The Plaintiff's G6PD deficiency, particularly the specific variant associated with his African ancestry, confers upon him resistance against malaria and does not necessarily predispose him to severe adverse reaction to primaquine. Indeed,

medical studies note those with the G6PD$_{African}$ variation are not susceptible to *Plasmodium Falciparum,* the most severe type of malaria. However, primaquine, the drug administered at the close-of-service (COS) to prevent a relapse of malaria, has *a possible* contraindication for individuals with a confirmed G6PD deficiency. It follows that The Plaintiff's genetic condition prevents him from contracting severe malaria prevalent on the African Continent. It further follows that because he is not susceptible to contracting this form of severe malaria, he has no reason to take primaquine if he follows the required malaria prophylaxis regimen during an extended stay in malaria endemic areas. According to Dr. Savage, The Plaintiff can take a reduced dose of primaquine as a terminal prophylaxis upon returning to the United States.

23.

Instead of fully considering all of the information stated above, the Pre-Service Review Board (PRB) let the genetic information on The Plaintiff serve as the sole basis for denying his employment and did not incorporate the expert medical opinion of a doctor familiar with the applicant's case or the applicant's past experience in a malaria-endemic country. While the PRB claims to be adhering to a policy not publicly available on the Peace Corps website, if such a policy does indeed exist, then PRB has failed to take into consideration the following:

   a. Plaintiff has a conferred immunity against malaria and will not be threatened by malaria during his service in Namibia;

   b. Plaintiff would have no need to take primaquine upon his return to the United States due to the G6PD deficiency;

   c. Plaintiff has demonstrated that he is in the group of people who do not have an adverse reaction to the administration of primaquine; and

   d. International medical guidelines clearly indicating dosing requirements for G6PD deficient individuals.

24.

Myrna D. Charles, Chief of Epidemiology and Surveillance, wrote decision rational upholding The Plaintiff's medical disqualification. Ms. Charles admits to the G6PD deficiency as the basis of medical disqualification.  Dr. Charles states "the applicant had evidence of anemia in submitted data." All laboratory reports submitted to the PCMO fall within the acceptable range required for clearance. On May 12, 2011, The Plaintiff's Hemoglobin level was 13.7g.dl and Hematocrit level was 45.4%.  Additionally, there is no medical evidence of hemolytic anemia in all-medical records submitted to the PCMO. The Plaintiff is not now and never has been anemic – medical records indicate no evidence of anemia, so her assertion is without medical basis and is wrong.

25.

In her responses, Dr. Charles failed to provide with any specificity the guidelines, policy, or medical studies that support her position related to The Plaintiff's inability to be deployed to a malaria-endemic country.  She cites without specificity the CDC and the WHO recommendations.

26.

According to the 2010 World Health Organization's *Guidelines for the Treatment of Malaria*, Second Edition, anti-relapse treatment with Primaquine should only be given to cases with confirmed diagnosis of *P. Vivax* or *P. Ovale* malaria.  WHO recommends the following for the treatment of *P. Vivax* malaria:  In mild-to-moderate G6PD deficiency, Primaquine 0.75 base/kg body weight given once a week for 8 weeks. In severe G6PD deficiency, Primaquine is contraindicated and should not be used.  The fact that the PRB claimed to review this information, but decided it wrongly, warrants additional review and ultimately, correction.

27.

The medical policies of the Peace Corps are discriminatory.  Discrimination based on genetic information prevents The Plaintiff from being hired, limits, segregates, and classifies him in a way that will deprive him of employment and will adversely affect his career progression.

28.

GINA prohibits the use of genetic information in making decisions related to any terms, conditions, or privileges of employment (e.g. hiring, firing, and opportunities for advancement).  Under Title II of GINA, which pertains to employment discrimination, an employer cannot discharge, refuse to hire, or otherwise discriminate against any employee because of that employee's genetic information.  While the Peace Corp has encouraged The Plaintiff to apply for other placements in non-malaria-endemic zones, the fact that reasonable accommodations and considerations are not being afforded to him will seriously inhibit, if not completely extinguish, his opportunity for advancement in service to sub-Saharan African countries.  Plaintiff's background, interest, and training are consistent with him working in African countries.  The PRB's decision precludes The Plaintiff's opportunities to excel.

29.

The Peace Corps has failed to make reasonable accommodations for The Plaintiff to serve in Namibia. The Plaintiff's G6PD mutation does not limits him from participating in major life activities. Those involved in the review of The Plaintiff's medical records improperly categorized him as either mentally physically impaired. This is discriminatory under ADA because OMS did not provide any accommodation for his newly discovered genetic mutation.

30.

Consistent with GINA and ADA, the Peace Corps should make reasonable accommodations for The Plaintiff in Namibia.   While the Peace Corps has suggested placement in an area or zone that is not malaria-endemic, such a placement would eliminate 77 percent of the opportunities in Peace Corps Response, and in this instance, would severely limit The Plaintiff's professional development.   It is not clear that The Plaintiff would be qualified to serve in one of these zones, if he would be accepted and offered a position. However, The Plaintiff's skill and experience made him a prime candidate for service in Namibia, and furthermore, his interest lies in countries in sub-Saharan Africa.   For the Peace Corps not to make any reasonable accommodations in the country where he was supposed to go, Namibia, but to suggest that he apply to a position in other zones falls short of the organization's obligation to attempt to remedy the situation with a reasonable solution.   As evidenced by the return of his passport with no further information, the Peace Corps summarily dismissed The Plaintiff from consideration for a position without exploring any other options for service in Namibia.   Again, absent seeing a copy of the G6PD process, The Plaintiff does not know if the Peace Corps states a process for making reasonable accommodations for those who have the G6PD genetic variation.

31.

Plaintiff believes that the nature of his specific G6PD variation is such that it will allow him to serve in a malaria-endemic area without problem because it is associated with a resistance to malaria.   If the Peace Corps seeks to protect its volunteers against contracting malaria, The Plaintiff is at a lower risk of malaria due to his genetic variation.   The possible contraindication *may* come from a G6PD deficient individual who takes primaquine, the chemoprophylactic drug used to prevent a relapse of malaria.   The Peace Corps has never

provided a written explanation why a person with immunity against malaria (associated with

G6PD$_{African}$) must take a prophylactic drug to prevent a relapse of malaria.

32.

Plaintiff notes that people with G6PD deficiency live in, travel to malaria-endemic areas,

and also serve as a part of the United States military in such zones.   They are not completely

banned from travel or service.   Plaintiff suggests that the Peace Corps could adapt the policy

similar to that of the US military to similarly allow him to serve with this genetic variation.

**The Peace Corps' G6PD policy that is the basis of genetic discrimination, if in existence, presents a racially and gender-based discriminatory policy that has an adverse effect on African-American males.**

33.

G6PD deficiency is considered the most common human enzyme deficiency, affecting

400 million persons globally.  G6PD deficiency is believed to be shared by 15% of African-

American men.  The blanket policy of the Peace Corps would adversely affect a number of

African-American men interested in serving in sub-Saharan countries if it were allowed to

stand.   Assuming that the Peace Corps has a G6PD policy that prevents those with the

deficiency from serving in malaria-endemic countries, this policy has a greater impact on

African-American males, and therefore, is an instance of racial and gender-based

discrimination.  This class of individuals is therefore distinctly disadvantaged from the Peace

Corps' policy.

34.

It is not contested that The Plaintiff was qualified for the Project Liaison position in

northern Namibia as evidenced by the offer the Peace Corps made to him. The actions of the

Peace Corps to deny The Plaintiff the ability to serve in Namibia – including the

organization's failure to provide the G6PD policy and the organization's failure to make

reasonable accommodations – all adversely affected his employment with the Peace Corps. While The Plaintiff does not know with certainty whether individuals who are not African-American males, or who do not have the G6PD deficiency have been extended reasonable accommodations or have been treated more favorably, The Plaintiff argues that the Peace Corps could do more to resolve this situation.

## THE PLAINTIFF WISHES TO FURTHER NOTE SPECIFIC ACTS, INCIDENTS AND INDIVIDUALS INVOLVED WHO PRESENT PROBLEMS WITH THE WAY HIS CASE HAS BEEN HANDLED:

35.

Ms. Wilste failed to provide The Plaintiff with the names and titles of people who were determining his fate.  This lack of information disadvantaged The Plaintiff; had he known the professionals who would be evaluating him, The Plaintiff would have assembled letters from similarly credentialed experts who supported his deployment.

36.

The Plaintiff was not provided information on how to seek recourse through the American Diversity Program. In fact, Ms. Angela Wiltse, RN, told The Plaintiff both written and verbally that the decision of the PRB appeal board was final and not subject to further review.  This is evidenced by the return of The Plaintiff's passport on May 31, 2011, definitive confirmation that the decision was final. The Plaintiff only became aware of the American Diversity Program upon his own research into the matter.

37.

Ms. Wilste failed to provide The Plaintiff with timely, written documentation of the determination of the PRB and process that was available to him for appeal.  The letter mailed from Peace Corps Headquarters on June 14, but dated May 26 appears to have been sent after significant activities in The Plaintiff's case had transpired and was not signed by an official at

the Office of Medical Services.  The Plaintiff believes the letter was sent after the fact to cover up procedures that were not originally followed, and because the Peace Corps became aware, that The Plaintiff planned to pursue a complaint with the American Diversity Program.

## EXHUASTION OF ADMINISTRATIVE REMEDIES

38.

The Plaintiff timely filed for Pre-Complaint Counseling and, thereafter, timely exhausted the requisite administrative remedies before the Equal Employment Opportunity Commission prior to timely filing this action.

39.

On July 14, 2011, the ADP received The Plaintiff's formal complaint via certified mail. On July 19, 2011, the agency accepted the issue as stated in the formal complaint. On July 25, 2011, the ADP informed The Plaintiff that Mr. Bruce Haurie, an "independent" EEO contractor from Delany, Seigal, Zorn & Associates (DSZ), would conduct a full investigation of his claim[11].

40.

Barry G. Simon, M.D., Chief of Clinical Programs in the Peace Corps Office of Medical Services asserted "the applicant has significant G6PD deficiency which makes him ineligible to serve at any post where malaria is endemic." I question what level of significance Dr. Simon is using to make this determination.  The initial G6PD test result was low, but in no way does this indicate the significance. Confirming the specific variation is the only way to

---

[11] According to the DSZ & Associates website: "For federal agencies, DSZ's experienced legal staff also provides written case analyses, including draft and final agency decisions. DSZ's investigative files have successfully guided employers through administrative hearings and litigation. Our final agency decisions have withstood EEOC and Court reviews and analyses." http://www.dsz.com/products-services/eeo-investigations.html

determine the significance of a G6PD deficiency. All G6PD variations are not the same in regards to the level of enzyme insufficiency and severity of adverse reactions triggered by "causative agents". International medical guidelines (WHO, CDC) clearly indicate that the spectrum of G6PD variations are linked to the severity of adverse reactions. The spectrum ranges from severe/life threatening adverse reactions (Favism) to mild/subclinical adverse reactions (specifically associated with the A- variant). In $G6PD_{African}$ variant, young blood cells have normal enzyme activity, while older blood cells are grossly deficient. In $G6PD_{MED}$ (favism) virtually all red blood cells are deficient. If Barry G. Simon, M.D., does not know The Plaintiff's specific variation, any judgment as to the significance of the confirmed G6PD deficiency is inaccurate and represents and improper use of discretion.

41.

On January 6, 2012, the ADP issued their Final agency Decision (FAD) based on the investigative report from DSZ finding insufficient evidence to support The Plaintiff's claim of discrimination. On January 11, 2012, The Plaintiff received the FAD via certified U.S. mail. Plaintiff wholeheartedly disagrees with the Final Agency Decision and is appealing the determination of the ADP following the stipulations indicated on the Notice of Right to Sue letter that listed the appropriate U.S. District court and the timeliness to bring a civil action against the agency (Exhibit 1).

## PRAYER FOR RELIEF

1. The Plaintiff demands the following remedial actions, beginning with the most preferred action:

   a. Reinstatement of The Plaintiff as a PCRV for immediate deployment to Namibia.

   b. Reasonable accommodations to allow him to be able to serve in a malaria-endemic zone. To his knowledge, the PRB did not attempt to provide such reasonable accommodations.

   c. Reconsideration of the preclusion of The Plaintiff serving overseas in a malaria-endemic zone by engaging a series of <u>medical doctors</u> and experts who can speak specifically to his case, including the fact that he served previously in a malaria-endemic country without any problems.

   d. Any other remedy not mentioned above but that is plausible to allow The Plaintiff to be an employee of the Peace Corps and that allows him to continue his career progression.

2. Grant The Plaintiff consideration of the fees and costs he has incurred for pursuing the matter.

3. For such other and further relief as the Court deems just and necessary.

Respectfully Submitted,

Imoite Omulepu
300 Duke Ellington Boulevard
New York, NY, 10025
Phone: (917) 969-0868
E-mail: imoite@gmail.com

<u>February 7, 2011</u>
Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Imoite I. Omulepu

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

   -against-

Aaron S. Williams, Director, Peace Corps

Barry G. Simon, M.D.; Myrna D. Charles; OMS, Peace Corp

Angela Wiltse, Peace Corps Response Nurse, Peace Corps
*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant.  Addresses should not be included here.)*

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

Jury Trial:   ☒ Yes   ☐ No
*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

☒      Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
***NOTE:** In order to bring suit in federal district court under Title VII, you must first obtain a
Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

☐      Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
***NOTE:** In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file a charge with the Equal Employment Opportunity
Commission.*

☒      Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
***NOTE:** In order to bring suit in federal district court under the Americans with Disabilities Act,
you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission.*

☐      New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297  (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

☐      New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

## I.      Parties in this complaint:

A.      List your name, address and telephone number.  Do the same for any additional plaintiffs named.
Attach additional sheets of paper as necessary.

Plaintiff          Name Imoite I. Omulepu

Street Address 300 Duke Ellington Boulevard

County, City New York (Manhattan), New York

State & Zip Code New York 10025

Telephone Number (917) 969-0868

B.      List all defendants' names and the address where each defendant may be served.  Make sure that the
defendant(s) listed below are identical to those contained in the above caption.  Attach additional
sheets of paper as necessary.

Defendant          Name Aaron S. Williams; Barry G. Simon; Myrna D. Charles; Angela Wiltse

Street Address Paul D. Coverdall Peace Corps Headquarters 1111 20th Street, N.W.

County, City Washington, DC

State & Zip Code District of Columbia, 20256

Telephone Number (800) 424-8580

C.      The address at which I sought employment or was employed by the defendant(s) is:

Employer United States Peace Corps

Street Address Paul D. Coverdall Peace Corps Headquarters, 1111 20th Street N.W.

County, City Washington DC

State & Zip Code District of Columbia, 20256

Telephone Number (800) 424-8580

## II.     Statement of Claim:

State as briefly as possible the facts of your case, including relevant dates and events.  Describe how you were
discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts
to support those claims.  You may wish to include further details such as the names of other persons involved
in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related
claims, number and set forth each claim in a separate paragraph.   Attach additional sheets of paper as
necessary.

A.  The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

X          Failure to hire me.

_____          Termination of my employment.

_____          Failure to promote me.

X          Failure to accommodate my disability.

_____          Unequal terms and conditions of my employment.

*Rev. 05/2010*                                    2

_____    Retaliation.

☒    Other acts *(specify)*: Examination/ Test _____.

**Note:**    *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.    It is my best recollection that the alleged discriminatory acts occurred on: May 26, 2011 ____.
                                                                          *Date(s)*

C.    I believe that defendant(s) *(check one)*:

☒    is still committing these acts against me.

_____    is not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

☒    race   African-American ___          ☐    color _____

☒    gender/sex   Male _____             ☐    religion _____

☐    national origin _____

☐    age.   My date of birth is _____ *(Give your date of birth only if you are asserting a claim of age discrimination.)*

☒    disability or perceived disability, G6PD Defiency _____ *(specify)*
☒    genetic Information

E.    The facts of my case are as follow *(attach additional sheets as necessary)*:

See attached _____

_____

_____

_____

_____

_____

_____

**Note:**    *As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.    Exhaustion of Federal Administrative Remedies:

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: July 7, 2011 _____ *(Date)*.

*Rev. 05/2010*                                    3

B.    The Equal Employment Opportunity Commission *(check one)*:

             _____    has not issued a Notice of Right to Sue letter.

              ☒    issued a Notice of Right to Sue letter, which I received on <u>January 11, 2012</u>   *(Date)*.

    *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.    Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

             _____    60 days or more have elapsed.

             _____    less than 60 days have elapsed.

## IV.    Relief:

**WHEREFORE**, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: <u>Reinstatement as a PCRV for immediate deployment to Namibia.</u>

<u>Reasonable accommodations to be able to serve in a malaria-endemic zone.</u>

<u>Grant The Plaintiff consideration of the fees and costs he has incurred for pursuing the matter.</u>
*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this **7** day of <u>February</u>          , 20<u>12</u> .

            Signature of Plaintiff     *[signature]*

            Address          <u>300 Duke Ellington Boulevard</u>

                            <u>New York, NY, 10025</u>

            Telephone Number     <u>(917) 969-0868</u>

            Fax Number *(if you have one)*   _____

# EXHIBIT 1



Since 1961.

CERTIFIED NO. 70072680000074092426
RETURN RECEIPT REQUESTED

January 6, 2012

Imoite Omulepu
300 Duke Ellington Boulevard
New York City, NY 10025

Dear Mr. Omulepu:

Enclosed is your Report of Investigation and the Final Agency Decision relating to the
EEO complaint filed by you and received on July 14, 2011.

Sincerely,

Grace Ross
American Diversity Program
Manager

Enclosures

(1)  Report of Investigation
(2)  Final Agency Decision re Case No. **PCV-11-06**



Since 1961.

**Imoite I. Omulepu**
**Complainant,**

**v.**

**Aaron Williams**
**Director,**
**Peace Corps**

**Agency Case No. PC-11-06**

**FINAL AGENCY DECISION**

### STATEMENT OF THE CLAIM

The Peace Corps accepted the following issue:

> Whether Complainant was discriminated against based on his disability (G6PD Deficiency), Genetic Information (G6PD), Race (African-American) and Sex (Male), when he was denied medical clearance, which was upheld on appeal, to serve as a Peace Corps Response Volunteer in Namibia resulting in his non-selection for the Peace Corps Response volunteer position of Kavango Basket Project Liaison in northern Namibia.

(Exhibit C1)[1]

### PROCEDURAL HISTORY

Peace Corps Volunteers (PCVs) are not employees of the Peace Corps. Applicants to become a PCV are not applicants for employment. PCVs and PCV applicants do not have access to the administrative processes of the Equal Employment Opportunity Commission (EEOC). However, the agency offers EEO counseling and investigation to a PCV or PCV applicant who believes s/he had been subjected to discrimination. Once a Final Agency Decision (FAD) has been rendered or 180 days have past since the complaint was filed, a PCV may file a case against the Agency in the appropriate U.S. District Court.

---

[1] All references are to exhibits in the Report of Investigation (ROI).

Complainant had applied and been accepted, pending medical clearance, to serve as a Peace Corps Response Volunteer (PCRV)[2] for a project in Namibia. Complainant was not medically cleared. He appealed the decision and learned on May 26, 2011, that his appeal had been denied. Complainant sought EEO counseling from the agency's Office of American Diversity Program (ADP) on June 8, 2011. Counseling failed to reach agreement between the parties, and on June 27, 2011, the EEO Counselor issued a notice of right to file a formal complaint. Complainant's formal complaint dated July 7, 2011, was received at ADP via mail on July 14, 2011. On July 19, 2011, the agency accepted the issue as stated above and subsequently investigated the claim. (Exhibits A1, B1, C1). This is the Agency's FAD based on the investigative report.

## STATEMENT OF THE FACTS

1. **Complainant** (African American, male, glucose-6-phosphate dehydrogenase (G6PD) enzyme deficiency) testified he does not consider himself to be mentally or physically disabled. He stated he identified one of his bases as disability because the EEO form he completed during informal EEO counseling included disability but did not list genetic information as a potential basis. (Exhibit F1a).

2. Under the PCRV Program, former PCVs who previously served for at least one year may apply for PCRV assignments which last from three to twelve months. Candidates apply for a specific position, assignment and country. After making a selection for a position, the PCRV Recruiter initiates a request for the medical clearance process. (Exhibit F6a).

3. Complainant previously served as a PCV in Mali from 2002-2004. On March 11, 2011, Complainant applied to serve as PCRV in the capacity of Kavango Basket Project Liaison in northern Namibia. He accepted the Agency's April 15, 2011, invitation to serve in this position "pending legal and medical clearances." Complainant completed the medical tests required for all PCRV applicants and had them submitted to the Agency's Office of Medical Services (OMS) as required. (Exhibits F1a, F5, F7 and F8).

4. **Angela Wiltse** (never tested for G6PD enzyme, White, female) has been the OMS Peace Corps Response Nurse Program Manager for three years. Ms. Wiltse's responsibilities include reviewing medical information provided by PCRV applicants and, when necessary, consulting with **Dr. Barry Simon** (does not know his G6PD blood level, Caucasian, male), who has had the responsibilities of OMS Medical Director for over three years. (Exhibits F2a-F2b, F3a-F3b).

5. One of the blood tests all PCRV applicants are required to take is of the G6PD enzyme level. According to Dr. Simon, G6PD is an enzyme found in red blood cells which facilitates certain chemical reactions. Dr. Simon stated that the

---

[2] A PCRV is a type of PCV and consequently a PCRV or PCRV applicant is not an employee or applicant for employment. To be eligible to be considered for a PCRV placement, the applicant must have previously served as a PCV. (Exhibits F2b, F6a).

enzyme is under genetic control in that it is a manifestation of one's genetic makeup, the way hair color is a manifestation of genetic makeup.   There are several genetic variations that result in a decreased enzyme level.   Only those with these genetic variations have a reduced enzyme level.   Agency Screening Guideline HEME-11 states that if a PCV applicant has a G6PD enzyme deficiency established by a quantitative test, the applicant can only be cleared to a non-malarial country.   Dr. Simon stated that exposure to certain drugs such as primaquine causes abnormal destruction of red blood cells (hemolysis).   According to HEME-11, this condition is most commonly found in those of African, Asian, Mediterranean, and Middle Eastern decent. (Exhibits F2a-F2b, F3a-F3b, F10).

6. Dr. Simon stated that in developing its guideline for G6PD enzyme deficiency OMS followed the recommendations of the Centers for Disease Control and Prevention (CDC) of the U.S. Department of Health and Human Services.   The *CDC Health Information for International Travel 2012* (Yellow Book) includes the following.   In Table 3-10 under primaquine: "Cannot be used in patients with glucose-6-phosphate dehydrogenase (G-6PD) deficiency." In Table 3-11, under primaquine: "Indicated for people who have prolonged exposure to P. vivax, P. ovale or both.   Contraindicated in people with G6PD deficiency."   Dr. Simon stated that primaquine is contraindicated for anyone with a G6PD enzyme deficiency as it can cause an abnormal destruction of the red blood cells which may trigger other health concerns.   Consequently, Peace Corps will not place a PCV with a G6PD enzyme deficiency in a malarial area where the PCV will be required to take primaquine.   Dr. Simon stated that it would be a violation of medical ethics to prescribe this medication to Complainant. (Exhibits F3a-F3b, F11).

7. Complainant's G6PD enzyme test was significantly below what is considered normal level.   Ms. Wiltse consulted with Dr. Simon who instructed her that with this enzyme level Complainant could not be sent to a malarial country like Namibia. (Exhibits F2a, F3a).

8. Dr. Simon testified the Peace Corps does not do genetic testing and does not request family medical history information.   Consequently, Dr. Simon does not know which of the genetic variations resulting in G6PD deficiency Complainant has.   Dr. Simon stated that studies looking at immunity to malaria in individuals with G6PD deficiency do not show consistent results.   At best, individuals with certain genetic variations of G6PD deficiencies may show an up to 60% reduction in severe cases of malaria.   These individuals still get infected with malaria.   Dr. Simon pointed out that there is no authority suggesting that individuals with G6PD deficiency should not be given malaria prophylaxis. (Exhibit F3a).

9. Ms. Wiltse telephoned Complainant on May 5, 2011, and informed him his test results showed a deficient G6PD enzyme level in his blood. She suggested she could work with him to see if there was another placement in a non-malarial area or he could take the test again to see if it was a "false positive." (Exhibits F1, F2a).

10. At the time of Complainant's deployment in 2002, the Agency's medical clearance did not require testing for G6PD enzyme. By the time of Complainant's close of service (COS) in 2004, testing for the G6PD enzyme was required. Complainant's COS medical evaluation indicated he was qualitatively tested for G6PD in September 2004 and the results were "normal." There were two options on the form "normal" or "deficient." No numeric value for G6PD level was provided. Complainant informed Ms. Wiltse about his 2004 G6PD test results. He recalled that at his COS he was prescribed and then completed a course of primaquine with no adverse reaction. Ms. Wiltse looked through Complainant's medical record and did not see any indication he had been prescribed and taken primaquine. She told Complainant that usually the PCMO will write a chron note at the COS physical indicating that the PCV had been given primaquine. There was no such note in Complainant's record. Ms. Wiltse informed Complainant she found a paper in his chart that stated "G6PD" and some additional illegible writing next to it. Complainant responded that he had documentation the PCMO had given him at his COS indicating that he had been given primaquine, and he would send it to her. (Exhibits F1a-F1b, F2a and F6e).

11. Complainant sent Ms. Wiltse a copy of a form letter which stated that he had been taking doxycycline. At the bottom of the form the following is printed: "HE/SHE HAS BEEN ADVISED TO CONTINUE THIS TREATMENT FOR 4 WEEKS AFTER LEAVING THE MALARIA ENDEMIC AREA. DURING THE LAST 2 WEEKS OF THIS TREATMENT, HE/SHE HAS BEEN INSTRUCTED TO TAKE PRIMAQUINE DAILY FOR 14 DAYS." Ms. Wiltse told Complainant that this form was not proof he took primaquine. She stated she asked him if he remembered the PCMO giving him primaquine pills. According to Ms. Wiltse, Complainant responded: "No, but I do remember taking the doxy." (Exhibit F2a).

12. Dr. Simon noted that there is no documentation that Complainant took primaquine after his service in Mali. Even if he had, there is no way of predicting what his response would be if he took it again. According to Dr. Simon, the Peace Corps has a responsibility, based on medical history and/or laboratory studies, not to place a Volunteer at a post where s/he would have a significantly increased risk of developing a serious medical problem either during service or as a result of treatment required for that service. (Exhibit F3a).

13. Complainant's re-test for the G6PD enzyme on May 12, 2011, confirmed his deficiency, that is his red blood cells contain a low level of the enzyme. (Exhibits F1 – F3, and F6c).

14. In a May 19, 2011, letter, Ms. Wiltse informed Complainant the Peace Corps had found him medically not qualified (MNQ) for service in any malaria-endemic country (including Namibia) because of his G6PD enzyme deficiency as the Agency would not be able to provide adequate and safe medical care. He was informed he might be eligible to serve in a non-malaria-endemic country. The letter stated Complainant could appeal the decision by providing additional medical information, but due to the short time frame before the Namibia project was to start on May 28, 2011, he had to complete his appeal quickly. (Exhibits F2, F9).

15. Ms. Wiltse stated that on May 19, 2011, she generated a list of non-malarial placements available to Complainant and submitted it to the PCRV Recruiter. She stated she informed Complainant that he could work with the Recruiter to see if any of the openings matched Complainant's skill set. Ms. Wiltse stated, and Complainant confirmed, that Complainant told her he was not interested in an alternative placement. (Exhibits F1a, F2b, F9).

16. Complainant appealed the MNQ decision to the Agency's Pre-service Review Board (PRB). He submitted a letter from Dr. David Savage, a hematologist and professor at Columbia University's College of Physicians and Surgeons. In the letter, Dr. Savage stated that, based on an exploratory physical examination and spectral analysis of Complainant's blood, in his professional medical opinion Complainant was "not at risk of clinically significant primaquine-induced hemolysis if he returned to sub-Saharan Africa." The letter stated the risk of Complainant's adverse reaction to primaquine "can be mitigated further by dose reduction and clinical monitoring." (Exhibit F12).

17. The PRB considered the appeal at its next scheduled meeting on May 25, 2011. Dr. Simon stated the standard procedure was followed in considering Complainant's appeal. Since Dr. Simon and Ms. Wiltse had participated in the original decision, neither of them were allowed to vote on the appeal. They could provide information to the PRB if asked. Dr. Simon could not recall whether he provided any comment in this case. (Exhibits F2a, F3a).

18. The PRB upheld the decision, and Complainant was informed in a May 26, 2011 letter issued by OMS. (Exhibit F14).

19. PRB member **Dr. Myrna Charles** (no G6PD enzyme deficiency, Black, female) testified that Complainant's appeal was denied because terminal prophylaxis with primaquine for long-term travelers to malaria-endemic countries is the current standard of care based on both CDC and World Health Organization (WHO) recommendations. People with known G6PD enzyme deficiency are at increased risk for hemolytic anemia from stressors including primaquine. This risk of complications due to primaquine is backed by scientific research and evidence. According to Dr. Charles, the question the PRB had to consider regarding someone in Complainant's situation is "what is an acceptable risk?" Dr. Charles testified it would be irresponsible to send someone to an area where a medication

which is recommended for routine, standard care would place this person at increased risk for a known, potentially serious complication. Dr. Charles noted that, while Complainant may not have contracted malaria during service in 2004, this does not confer immunity against future infection. (Exhibits F4, F13).

20. Ms. Wiltse recalled that over the past two years, she reviewed the file of one other PCRV applicant, other than Complainant, who tested with a G6PD enzyme deficiency. That applicant, who was also slated to serve in a malaria-endemic country, chose not to serve. He was male and his race was unknown to Ms. Wiltse. (Exhibit F2a).

21. According to Agency records, during the period from May 2009 to May 2011, three applicants for PCRV positions (including Complainant) were diagnosed with a G6PD deficiency. All were male. Race was unknown, except for Complainant who disclosed this information. None were permitted to serve in a malaria-endemic area. (Exhibit F15).

22. Agency records, based on volunteer self-identification, show that between May 1, 2009, and August 31, 2011, accepted applicants for PCRV placements included 26 Blacks, 9 females and 7 males. The total number of men in PCRV placements was 196 and the total number of females was 250. During that same time period, accepted applicants for PCV placements included 398 Blacks, 286 females and 112 males. Overall PCV placements included 4839 females and 3139 males. (Exhibit F21).


## ANALYSIS

**Standards for Discrimination Determinations**

The Peace Corps EEO policy statement signed by the Director in 2011, which applies to all employees and volunteers (and applicants for those positions), states that no person will be denied equal opportunity under applicable laws for employment and volunteer service opportunities because of, among other things, race, sex, disability, and genetic information. (Exhibit F20).

In making determinations regarding claims, such as this one, brought pursuant to this policy, the Peace Corps follows the standards and court decisions used to determine whether there has been a violation of Title VII of the Civil Rights Act of 1964, as amended, (Title VII), for claims of race and sex discrimination; of the Americans with Disabilities and Rehabilitation Acts, as amended, for claims of disability discrimination; and of the Genetic Information Nondiscrimination Act of 2008 (GINA), for claims of genetic information discrimination.

6

Since Complainant is not pursuing a disability basis, standards for disability claims will not be discussed.

**Standards for Genetic Information Discrimination**

GINA generally bars the use of genetic information in any employment decision.[3] Therefore, the analysis of the current GINA claim requires a determination of whether genetic information was obtained by the Agency and, if it was, whether that information was used in the decision to find Complainant medically non-qualified.

Genetic information includes information about an individual's genetic tests and the genetic tests of an individual's family members, as well as information about the manifestation of a disease or disorder in an individual's family members (i.e. family medical history). Family medical history is included in the definition of genetic information because it is often used to determine whether someone has an increased risk of getting a disease, disorder, or condition in the future.[4]

The GINA statute defines genetic test as an analysis of human DNA, RNA, proteins, or metabolites that detects genotypes, mutations, or chromosomal changes. According to the statute, if an analysis does not detect genotypes, mutations, or chromosomal changes it is not a genetic test. See, GINA, Title II, Section 201(7)(A)(B).[5]

---

[3]  It will usually be unlawful for an employer to get genetic information. There are six narrow exceptions to this prohibition, none of which apply to the instant case. The exceptions are: (1) Inadvertent acquisitions of genetic information. (2) Genetic information (such as family medical history) may be obtained as part of health or genetic services, including wellness programs, offered by the employer on a voluntary basis, if certain specific requirements are met. (3) Family medical history may be acquired as part of the certification process for FMLA leave where an employee is asking for leave to care for a family member with a serious health condition. (4) Genetic information may be acquired through commercially and publicly available documents like newspapers, as long as the employer is not searching those sources with the intent of finding genetic information or accessing sources from which they are likely to acquire genetic information. (5) Genetic information may be acquired through a genetic monitoring program that monitors the biological effects of toxic substances in the workplace where the monitoring is required by law or, under carefully defined conditions, where the program is voluntary. (6) Acquisition of genetic information of employees by employers who engage in DNA testing for law enforcement purposes as a forensic lab or for purposes of human remains identification is permitted, but the genetic information may only be used for analysis of DNA markers for quality control to detect sample contamination.

[4]  Genetic information also includes an individual's request for, or receipt of, genetic services, or the participation in clinical research that includes genetic services by the individual or a family member of the individual, and the genetic information of a fetus carried by an individual or by a pregnant woman who is a family member of the individual and the genetic information of any embryo legally held by the individual or family member using an assisted reproductive technology. None of these factors are present in the instant case.

[5]  A copy of the Act is at Exhibit F18.

**Standards for Sex and Race Discrimination**

Eligibility and standards for Peace Corps Volunteers are laid out at 22 C.F.R. Part 305. In selecting individuals for Peace Corps Volunteer service, as required by section 5(a) of the Peace Corps Act, as amended, there shall not be any discrimination against any person on account of race, sex, creed, color, age, or disability. 22 C.F.R. Part 305.1.

Allegations of discrimination under Title VII are subject to the McDonnell Douglas analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas a complainant must establish a *prima facie* case of discrimination by showing: 1. That (s)he is a member of a protected class; 2. That (s)he was harmed by an employment action; and 3. that (s)he was treated differently from similarly situated employees not in complainant's protected class. In the absence of comparative evidence, a complainant may provide other evidence showing discriminatory intent.

Once a complaint meets the burden of establishing a *prima facie* case, there is a presumption of discrimination which the employer must rebut by offering a legitimate non-discriminatory reason for its action. If the employer articulates a legitimate, non-discriminatory basis for the action, the presumption drops away, and the Complainant must show that management's reasons are pretextual, designed to conceal the actual discriminatory reasons for the action. McDonnell Douglas Corp., supra, and cases following. A complainant must show by a preponderance of the evidence that management did not act because of the reasons it offers and persuade the fact finder that the action was, in reality, motivated by prohibited factors.

Throughout the process, it is the Complainant who has the burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on discriminatory criterion illegal under the Act. Furnco Constr. Corp. v Waters, 438 U.S. 567, 98 S. Ct. 2943 (1978).

**Analysis Genetic Information Discrimination**

The Agency did not gather genetic information or conduct a genetic test. Complainant was not asked for family medical history. Complainant was required to take a blood test, like every other PCV or PCRV applicant, in order to determine his current medical condition. The analysis did not detect genotypes, mutations, or chromosomal changes. Therefore, by statutory definition, it is not a genetic test. The blood test looked only for a deficiency in the G6PD enzyme level currently in the blood. Complainant's genotype is unknown (he believes he is aware of his G6PD variant but if he is that information did not come from the test he took as part of the medical qualification process). There was no examination of mutations or chromosomal changes. The only information provided was the current level of the enzyme in Complainant's blood. The Peace Corps needed

8

this information because it follows guidelines promulgated by the CDC, a Federal agency, requiring anyone who lives for a sufficient time in a malarial-endemic country to take presumptive anti-relapse therapy (PART) at the end of service. Primaquine is the only medication available for PART. However, primaquine is contraindicated for anyone with a G6PD enzyme deficiency due to potentially serious side effects, including hemolysis. After the test is conducted, the Agency has no information on Complainant's genotype, mutations, or chromosomal changes. The only information the Agency has relates to his present inability to engage in a required therapy to prevent malarial relapse after he leaves a placement in Namibia.

Further, the information was not used in an "employment" action and Complainant was not barred from Volunteer service. When low levels of the enzyme are discovered, the applicant is not disqualified but simply cannot be posted to a country where malaria is endemic. Alternative postings were not considered in Complainant's case because he opted not to pursue them. The Agency was ready and willing to initiate the process.

Complainant's own medical history appears to demonstrate that G6PD enzyme levels in blood may change over time. His medical records from his prior Volunteer posting in Mali did not show his G6PD enzyme levels as abnormal. Therefore, testing these enzyme levels during his latest application process provided information on a current condition, not on the past or the future.

There is no evidence that every person with certain variants of the G6PD gene will always have a deficient level of G6PD enzyme in their blood. However, there is evidence that for those who currently have deficient levels of G6PD enzyme the use of primaquine, the only available anti-malarial drug available for PART, is contraindicated.

If GINA barred the Peace Corps from conducting such a blood test, the Agency would be required to place Volunteers in areas where they could be at increased risk of serious medical complications. To do so would be irresponsible and medically unethical. According to Dr. Simon, G6PD enzyme deficiency affects 200-400 million people worldwide. If the Agency is not allowed to screen for G6PD enzyme deficiency in determining appropriate placement, a significant number of future PCVs will be at risk for hemolysis when they take primaquine after their close of service.

Complainant indicated that G6PD is an X-linked recessive gene, meaning he inherited it from his mother. He contended that therefore conducting the G6PD enzyme blood test constituted obtaining family medical history and is therefore a GINA violation. The blood test does not provide family medical history. It merely indicates that there is a current deficiency of an enzyme in the blood that prevents someone from taking medication required if placed in a malarial environment. According to Dr. Simon, if the Agency had asked Complainant to provide information regarding the G6PD levels of his parents and then medically disqualified him without testing him for G6PD deficiency, this would be a violation of GINA because it would be using family history in the decision process. However, the Agency did not follow this course, but rather made a

9

decision based on the results of Complainant's G6PD enzyme test without regard to or knowledge of his family history.

Complainant claimed that after reviewing Dr. Simon's testimony, he contacted the CDC malaria hotline. He asserted he was informed that primaquine is primarily used for those in Central America and Southeast Asia, areas with a high prevalence of P. vivax, a type of malaria. He stated he was told that there is little chance of exposure to P. vivax in Namibia, where the primary type of malaria is P. falciparum. Complainant's hearsay evidence of what someone may have told him is not credible given trained Agency medical staff testimony to the contrary.

Complainant's interest in serving a second time as a Volunteer is highly commendable. The Agency did not reject him outright because of the results of his blood test. It wanted to accommodate him through an alternative placement in a country where malaria is not endemic. For professional reasons, he did not wish to pursue any Volunteer opportunities outside of African countries where malaria is a risk. That is his prerogative but he, not the Agency, made that choice.

In sum, as defined by GINA, the Peace Corps did not obtain Complainant's genetic information during its medical clearance process and the G6PD enzyme blood test the Agency required is not a genetic test.

### Analysis Sex, Race, and Disability Discrimination

#### *Prima Facie* Case

Complainant is an African-American male. He belongs to protected groups by race and gender. Complainant stated that he does not have a disability and has dropped that basis.[6]

Complainant did not suffer an adverse "employment" action. Complainant was not able to serve in the placement in Namibia where for professional reasons he wanted to go. Another placement in a non-malarial country requiring the same skill set may have existed but Complainant declined to consider alternatives.

Complainant was not treated differently than any other PCRV or PCV applicant. He was required to take the same medical tests and subjected to the same medical standards as

---

[6] If he had continued with that basis, the record appears to show that he would not have met the test for a qualified disabled individual based on his G6PD enzyme deficiency. He testified his G6PD enzyme deficiency does not limit any major life activity. Even if it were found to be a disabling condition as defined by law, Complainant would not be qualified as, due to the contraindication of primaquine, the only accommodation available is placement in a non-malarial country, an accommodation he was offered and rejected. The accommodation suggested by the documentation he provided during his appeal that the dosage of primaquine could be monitored and altered as necessary is not available since, at the time the primaquine would be administered, Complainant would no longer be a Volunteer and the Agency would no longer have responsibility for his current medical needs.

any other applicant. The same procedure was followed in his case as in others to arrive at the medical qualification decision, and he was afforded the same appeal process which the Agency followed in other cases. Further, there is evidence that significant numbers of African Americans and men (and African American men) are found qualified to be PCRVs and PCVs.

Although Complainant cannot establish a *prima facie* case on sex and race and has withdrawn his claim of disability discrimination, I continue the analysis through the remaining stages of the standard of proof.

## Management's Legitimate Non-discriminatory Reason

Ms. Wiltse, Dr. Simon and Dr. Charles, supported by documentation, provided the Agency's legitimate, nondiscriminatory reason for its decision. Complainant applied to become a PCRV in Namibia, a country where malaria is endemic, and was selected pending medical qualification tests. He underwent standard medical tests required of any PCRV or PCV before any placement can be confirmed. One such test is of the level of G6PD enzyme in the blood. Complainant's initial test showed his level of this enzyme was significantly below normal. His retest showed the same result. Any PCRV or PCV who is to be placed in a country where malaria is endemic is required to undertake presumptive anti-relapse therapy (PART). The only drug available for PART is primaquine which is contraindicated for anyone with a G6PD enzyme deficiency. Complainant would be required to take primaquine after his service was over. Therefore, the Peace Corps is not in a position to put in place and monitor the dose reduction and proper clinical monitoring as suggested by Complainant's supporting documentation as an accommodation. The Agency determined that Complainant was medically not qualified (MNQ) to serve in Namibia due to his enzyme deficiency which meant that there was no PART medication he could take. The Agency offered to consider Complainant for a placement in a non-malarial country but Complainant rejected alternative placement. It would have been irresponsible to send someone to an area where the medication which is recommended for routine, standard care would place them at increased risk for a known, potentially serious complication.

## Pretext

Complainant failed to show by a preponderance of the evidence that the agency's proffered reasons are pretext for race or sex (or disability) discrimination.

Complainant contended that he was not given sufficient time to gather and present information to the PRB. However, it was the imminent start of the Namibian project in which Complainant wished to participate which dictated the time frame. There is no evidence the Agency delayed the initial medical review of Complainant's test and additional time was taken up with Complainant's retest which could not have been foreseen when his medical work up was initiated.

Complainant claimed that members of the United States military with G6PD enzyme deficiency are not completely banned from travel to or service in malaria-endemic areas and suggested the Peace Corps could adapt a similar policy. Dr. Simon is not aware of the US military policy regarding its members with G6PD enzyme deficiency. He indicated that short visits to malaria-endemic areas do not require PART. The fact that two different Federal agencies may have different policies regarding G6PD enzyme deficiency and PART does not make the divergent policies discriminatory. The same Peace Corps policy is applied to all applicants regardless of race, or sex, or any other EEO basis.

Complainant claimed the Agency failed to consider his past medical history. Complainant noted he previously served as a PCV in another malaria-endemic area without contracting malaria and without having any adverse reaction to taking primaquine upon his return to the US. He believed this showed he is asymptomatic (he has never had anemia associated with his deficiency) and able to perform all the functions of a PCRV in malaria-endemic areas without jeopardizing his health. He contended that Dr. Savage corroborated this. Ms. Wiltse, Dr. Simon, and Dr. Charles dispute his contentions. They indicate that documentation does not support Complainant's claim he has taken primaquine. An independent review of the evidence provided by Complainant supports their conclusion. Further, even if he had taken primaquine without issue in the past, there is no medical information showing that he would not have problems in the future.

Complainant believed he has the gene variant $G6PD_{African}$. He argued that medical studies indicate those with the $G6PD_{African}$ variation are not susceptible to the most severe type of malaria and therefore he has a conferred immunity against malaria. With a conferred immunity, he would not need to take primaquine upon his return to the US. Since there was no genetic test conducted, there is no evidence which G6PD variation Complainant may have. Even if he has the African variant, Dr. Simon indicated that there is no medical authority which supports the position that those with that variant have a conferred immunity to malaria.

According to Complainant, G6PD deficiency is believed to be shared by 15% of African-American males. He contended the Agency's policy of preventing anyone with this deficiency from serving in malaria-endemic countries has a greater adverse impact on African-American males who are interested in serving in sub-Saharan countries. Complainant's claim is speculative. There are African-American males serving in the Peace Corps in countries throughout the world. Not every African-American, male or female, only wants to provide Volunteer services to a sub-Saharan country. Further, this is not an adverse impact complaint. It was accepted as a claim of individual disparate treatment.

Complainant contended that he could have been accommodated by variation in the dose of primaquine he was given along with appropriate monitoring. Dr. Charles pointed out that Complainant would not be in Volunteer service when the primaquine was administered so this is not an effective accommodation for the Agency to administer.

12

The only reasonable accommodation is to send Complainant to a post where malaria is not endemic.  That accommodation was offered Complainant, as alternative postings are offered to other PCRVs who for whatever reason cannot be accommodated in their posting of choice.  Complainant was not treated differently.

There are several variants of G6PD which could result in low levels of G6PD enzyme.  They include varieties which are African, Asian, Mediterranean, and Middle Eastern.  Therefore, many racial groups, as well as both sexes, might test with deficient levels of G6PD enzyme in their blood.

In sum, Complainant has not shown there was a violation of GINA.  Further, he has not established a prima facie case of race or sex discrimination because he was not treated differently than any other Volunteer applicant and did not suffer an adverse action.  He has withdrawn his disability claim, but based on his own testimony he cannot show he is a qualified disabled individual as defined by statutes.  Even if he had established prima facie cases on any of these bases, the Agency provided legitimate, nondiscriminatory reasons for its decision.  Complainant failed to show that those reasons were pretext for discrimination.

# EXHIBIT 2

## STATEMENT OF CONCLUSIONS AND RELIEF

I find that Complainant has not proved by a preponderance of the evidence that he was discriminated against based on his disability, genetic information, race, and sex, when he was denied medical clearance, which was upheld on appeal, to serve as a Peace Corps Response Volunteer in Namibia, resulting in his non-selection for the Peace Corps Response volunteer position of Kavango Basket Project Liaison in northern Namibia. Because complainant has not prevailed on his claim, no relief is awarded.

### RIGHTS

A Volunteer, trainee, or applicant is authorized to file a civil action in an appropriate U.S. District Court:

1. Within thirty (30) calendar days of his or her receipt of the notice of final action taken by the agency.

2. After one hundred eighty (180) calendar days from the date of filing a complaint with the agency if there has been no final agency action.

For those complaints alleging discrimination that occur outside the United States, the U.S. District Court for the District of Columbia shall be deemed the appropriate forum.

*Grace M Ross*                              *Jan 6 2012*

Grace Ross, ADP Director                    Date

14

CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received this forgoing FINAL
AGENCY DECISION within five (5) calendar days after the date it was sent via certified mail. I
certify that on January 6, 2012, the forgoing FINAL AGENCY DECISION was sent by certified
mail return receipt requested, postage prepaid to the following:

Imoite Omulepu
300 Duke Ellington Boulevard
New York City, NY 10025

Grace Ross, Manager
American Diversity Program

Cc: Marianne Perciaccante
    Office of General Counsel
    Peace Corps Headquarters